**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KIANA BROOKENS, as administratrix of the estate of Z.W.,** | Civil Action |
| *Plaintiff*, | No. 18-4640 |
| *v.* | |
| **CITY OF PHILADELPHIA, *et al.*,** | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION**</u>

**GOLDBERG, J.**                                                         **January 3, 2022**

This lawsuit arises from the tragic murder of an infant, Z.W., at the hands of his mother's romantic partner. Defendants' Motion for Summary Judgment presents the question of whether an employee of Pennsylvania's Department of Human Services can be held liable because she briefly removed and then returned the child to the mother. For the reasons explained below, I hold that she cannot and will therefore grant Defendants' Motion for Summary Judgment.

**I.      <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

Except where noted, the following facts are undisputed. Where disputed, I view the evidence in the light most favorable to Plaintiff as the party opposing summary judgment. <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1081 (3d Cir. 1996).

**A.      Z.W.'s Birth and Parentage**

The child, Z.W., was born in September 2014. His mother was Andrea Worrell ("Worrell"). (Plaintiff's Exhibit C; Plaintiff's Exhibit A at 18; Defendants' Facts ¶ 1.)

**B.      Warning Signs for Z.W.'s Safety**

Signs that that Z.W. might be in danger began before he was born. Worrell abandoned her first child, S.W., by leaving him with Plaintiff Kiana Brookens (Worrell's cousin). Although Worrell later regained partial custody of S.W. through supervised visits, Worrell rarely scheduled these visits and had little contact with S.W. (Plaintiff's Exhibit A at 9-10, 18-20; Plaintiff's Exhibit B.)

When Z.W. was one year old, a General Protective Services (GPS) report stated Worrell had left S.W. unsupervised on the street. The report also raised concerns that Worrell inadequately supervised Z.W., lived with a boyfriend who was a drug dealer, and suffered from mental health issues. (Plaintiff's Exhibit C at CITY 1003-04.) When Z.W. was twenty months old, a second GPS report found "ongoing" concerns with S.W. being left alone with drug dealers. (Plaintiff's Exhibit E at CITY 1055.)

The second GPS report spurred Pennsylvania's Department of Human Services (DHS) to assess the safety of Worrell's children. Defendant Santa-Torres, a DHS employee, began the investigation with a visit to Worrell's cousin (Plaintiff), and learned that Worrell was "unstable," "transient," and brought her children to unsafe locations. (Plaintiff's Exhibit F at 73-74.) Santa-Torres next visited Worrell and learned that Worrell was unemployed, suffered from mental health issues, and had a history of drug use. (Plaintiff's Exhibit G at CITY 1073.) Thereafter, Santa-Torres and Worrell visited Z.W.'s alleged biological father, who became verbally aggressive, insisted Z.W. was not his child, and demanded a DNA test, forcing the visitors to leave for their own safety. (Id. at CITY 1082; Plaintiff's Exhibit F at 103-107.)

On July 23, 2016, Worrell was involved in a domestic violence incident with her romantic partner Rimear Custis. Custis punched Z.W. and attacked Worrell with bleach, also knocking out her tooth. Worrell and Z.W. went to the emergency room, criminal charges were filed against

2

Custis, and Custis was arrested. Worrell and Z.W. then moved into a domestic violence shelter. (Plaintiff's Exhibit A at 62; Plaintiff's Exhibit G at 1117, 1154.)

Santa-Torres was aware of these facts. (See above citations to Santa-Torres's own reports.) Santa-Torres also knew Custis's mistreatment of Worrell spanned more than a single episode and was in fact an "abusive relationship." (Plaintiff's Exhibit A at 62-63.)

### C.    Santa-Torres's Temporary Custody of Z.W.

What happened next is disputed. Because I am considering Defendants' Motion for Summary Judgment, I must accept Plaintiff's view of these facts.

According to Plaintiff, Santa-Torres temporarily removed Z.W. from Worrell because the abusive relationship between Worrell and Custis concerned her. In support, Plaintiff offers her own testimony and that of Worrell's mother. Both testified to receiving calls from Santa-Torres in which Santa-Torres stated she had taken Z.W. from Worrell and was traveling with Z.W. on the train. (Plaintiff's Exhibit A at 54-58; Plaintiff's Exhibit H at 16-17.) Although Santa-Torres disputes ever taking Z.W. from Worrell, testimony from Plaintiff and Worrell's mother is sufficient for a jury to credit Plaintiff's account of this part of the incident.

Once Santa-Torres took custody of Z.W., she asked both relatives whether they could assume responsibility for Z.W.'s care. Plaintiff said she would. These discussions continued over multiple phone calls. (Plaintiff's Exhibit A at 48-51; Plaintiff's Exhibit H at 10-12.)

In the end, Santa-Torres did not place Z.W. with either relative. According to Plaintiff, Santa-Torres gave up on her efforts because she felt sorry for Worrell. Consequently, Santa-Torres relinquished custody of Z.W. and left him once again with Worrell. (Plaintiff's Exhibit A at 59-60.)

Both parties acknowledged at oral argument that it is unclear from this record where Worrell was living at the time Santa-Torres returned Z.W. to her. Nevertheless, given the ongoing

relationship between Worrell and Custis and the fact that Worrell's stay at the domestic violence shelter was by its nature temporary, and viewing all facts in Plaintiff's favor, it is reasonable to infer that Santa-Torres would have known that returning Z.W. to Worrell could lead to future interactions between Z.W. and Custis.

### D.    Z.W.'s Murder

On November 29, 2016, a few months after Z.W. was returned to Worrell, police responded to an emergency call at Worrell's residence and found Z.W. nonresponsive, barely breathing, and with blue lips. Examination at the hospital revealed interior chest bruising. Z.W. was pronounced dead the next day. (Plaintiff's Exhibit I; Plaintiff's Exhibit J at PLA000012.)

Custis was charged and convicted of Z.W.'s murder. Worrell pleaded guilty to endangering the welfare of a child. (Plaintiff's Exhibit L; Plaintiff's Exhibit D.)

An internal DHS review found problems with the way Santa-Torres handled her investigation. In particular, DHS faulted Santa-Torres for ignoring red flags and missing opportunities to investigate whether Z.W. might be in danger. (Plaintiff's Exhibit M at 4.) At oral argument, counsel for Santa-Torres appropriately acknowledged that Santa-Torres was aware of signs that Custis might pose a danger to Z.W.

### E.    Plaintiff's Claims Against Santa-Torres

On October 29, 2018, Plaintiff, as administrator of Z.W.'s estate, filed a complaint against Santa-Torres in connection with the events set out above.[1] Plaintiff brings a claim against Santa-Torres under 42 U.S.C. § 1983 for violation of Z.W.'s rights under the Fourteenth Amendment to the United States Constitution. In Plaintiff's view, Santa-Torres is liable for Z.W.'s murder, as a

---

[1] Plaintiff's Complaint also named the City of Philadelphia as a defendant. Plaintiff now states she will not pursue her claims against the City.

state-created danger, because Santa-Torres returned Z.W. to Worrell despite knowing Worrell was in an abusive relationship and that Z.W. would be in danger.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. <u>Kaucher v. Cnty. of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. <u>Galena v. Leone</u>, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. <u>Schaar v. Lehigh Valley Health Servs., Inc.</u>, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing <u>Williams v. Borough of W. Chester, Pa.</u>, 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." <u>Id.</u> at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

Plaintiff's claim rests on the "state-created danger" doctrine, which holds that the government violates an individual's rights under the Fourteenth Amendment's Due Process Clause when the government's affirmative acts endanger a person through conduct so blameworthy that it "shocks the conscience." Bright v. Westmoreland Cty., 443 F.3d 276, 281-82 (3d Cir. 2006). Santa-Torres responds that she did not create the danger that led to Z.W.'s death. For the reasons stated below, I agree with Santa-Torres.

### A.      The "State-Created Danger" Doctrine

The Due Process Clause of the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This prohibition, however, does not "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors." Deshaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989). Therefore, "[a]s a general matter, … a State's failure to protect an individual against private violence … does not constitute a violation of the Due Process Clause." Id. at 197.

Nevertheless, state officials may be liable for some violent acts by private parties if the state itself exposed the injured person to danger. Under the "state-created danger" doctrine, a state actor violates the Due Process Clause when the following elements are met:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) [the] state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Bright, 443 F.3d at 281 (quotation marks omitted).

In L.R. v. Sch. Dist. of Phila., 836 F.3d 235 (3d Cir. 2016), a kindergarten teacher allowed a student to leave the classroom with a stranger, leading to a sexual assault. Id. at 239-40. The teacher was potentially liable under a state-created danger theory because, "[w]hen [the teacher] allowed [the student] to leave the classroom with an adult who failed to produce proper identification or verification, [the teacher] exposed [the student] to a danger she would not have otherwise encountered." Id. at 243.

By contrast, in Deshaney v. Winnebago Cty. Dep't of Soc. Servs., state officials were not liable for the abuse of a child because the state played no role in creating the danger. There, a child was placed in the temporary custody of a hospital after suffering injuries indicative of child abuse, but then released when a panel of experts found insufficient grounds for withholding the child from his father. 489 U.S. at 192. The father then beat the child so severely that the child was permanently disabled. Id.

In finding the state employees not liable under the Due Process Clause, the Supreme Court reasoned that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201. The hospital's temporary custody of the child did "not alter the analysis" because returning the child to his father "placed him in no worse position than that in

which he would have been had [the state] not acted at all." <u>Id.</u> "[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter." <u>Id.</u>

The difference between <u>L.R.</u> and <u>Deshaney</u> is that in <u>L.R.</u>, the state itself created the danger, whereas in <u>Deshaney</u>, the state merely failed to protect against a danger that already existed. <u>See</u> <u>L.R.</u>, 836 F.3d at 243-44. To decide whether a danger is state-created, a court should "first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then … ask whether the state actor's exercise of authority resulted in a departure from that status quo." <u>Id.</u> at 243. In <u>L.R.</u>, the status quo was a safe kindergarten classroom where permitting a student to leave was a departure that exposed the student to danger. <u>Id.</u> By contrast, in <u>Deshaney</u>, the status quo was the child's former home with his abusive father, and the state's temporarily removing the child to a hospital did not expose the child to any greater danger than had the state not intervened at all. <u>Id.</u>

**B.     Application of the State-Created Danger Doctrine to Plaintiff's Claim Against Santa-Torres**

In light of the undisputed facts before me, and accepting evidence proffered by Plaintiff in the light most favorable to her, I conclude as a matter of law that Santa-Torres cannot be liable under the state-created danger doctrine. As in <u>Deshaney</u>, Santa-Torres's actions did not result in a departure from the status quo of Custis having access to Z.W. Although Plaintiff urges the "status quo" should be assessed at Z.W.'s temporary safety with Santa-Torres, <u>Deshaney</u> forecloses this argument. When the state temporarily removes a child from a dangerous home only to return it, the "status quo" is the danger to which the child would have been exposed had the state never intervened at all. <u>L.R.</u>, 836 F.3d at 243. Here, the undisputed facts show that the status quo consisted of Z.W. living with Worrell. There is no evidence Santa-Torres did anything to increase Z.W.'s exposure to danger beyond what he previously faced from Worrell and Custis.

Plaintiff seeks to distinguish <u>Deshaney</u> on the ground that Santa-Torres's investigation and temporary custody of Z.W. were affirmative acts. However, to hold Santa-Torres liable, Plaintiff must show that those affirmative acts "created a danger to [Z.W.] or … rendered [Z.W.] more vulnerable to danger than had the state not acted at all." <u>Bright</u>, 443 F.3d at 281. The undisputed facts before me establish that, without DHS, Z.W. would have remained with Worrell.

Plaintiff also notes that the decision to return the child in <u>Deshaney</u> to his father was made after finding insufficient justification to keep him in the hospital. 489 U.S. at 192. Plaintiff contends the present facts are distinguishable because Santa-Torres had authority to withhold Z.W. from Worrell and place him with a relative. While these facts may make Santa-Torres's decision to return Z.W. to Worrell more questionable, it does not change whether Santa-Torres created the danger Z.W. faced when he was with Worrell. <u>See id.</u> at 201.

The case most favorable to Plaintiff is <u>Tazioly v. City of Philadelphia</u>, No. 97-cv-1219, 1998 U.S. Dist. LEXIS 14603 (E.D. Pa. Sep. 10, 1998). There, a child was held at a hospital from birth and then moved to foster care. <u>Id.</u> at *11-12. Two years later, foster care was terminated and the child was delivered to the mother, after which the child was severely injured <u>Id.</u> at *14-15, *17-18.

The district court in <u>Tazioly</u> distinguished <u>Deshaney</u> in two respects. First, the court reasoned the hospital's custody of the child in <u>Deshaney</u> was temporary whereas the foster arrangement in <u>Tazioly</u> was not. <u>Id.</u> *32-33. Second, the <u>Tazioly</u> court found it significant that the hospital in <u>Deshaney</u> possessed "insufficient evidence of child abuse" to keep the child whereas DHS had "actual knowledge" of the <u>Tazioly</u> mother's violent propensities. <u>Id.</u> at *33.

As to <u>Tazioly</u>'s first ground, the case before me does not present the question of whether the state may hold a child for so long that to return the child to its parent is a "departure from [the]

status quo." <u>See</u> <u>L.R.</u>, 836 F.3d at 243. Plaintiff concedes Santa-Torres had custody of Z.W. for less than a day. That time was not long enough to affect Z.W.'s safety or for Worrell's situation to worsen in the interim. <u>Tazioly</u>'s distinction between temporary and permanent custody therefore does not apply to the present facts. As to <u>Tazioly</u>'s second ground, <u>Deshaney</u>, which is binding precedent, forecloses that the state's "knowledge of [an] individual's predicament" may give rise to a duty to protect. 489 U.S. at 200. As such, Santa-Torres's knowledge that Z.W. could be in danger if returned to Worrell is insufficient to impose on Santa-Torres a duty to protect Z.W. from that danger.

For these reasons, taking all facts in the light most favorable to Plaintiff, Santa-Torres is not liable for Z.W.'s murder because she did not create the danger that caused it. I will therefore grant Santa-Torres's Motion for Summary Judgment.

## IV.    <u>CONCLUSION</u>

For the reasons given, I will grant Santa-Torres's Motion for Summary Judgment. Because Plaintiff states she is no longer pursuing claims against the City of Philadelphia, I will dismiss those claims as well.

An appropriate order follows.